IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Norfolk Division

**ENKHBAYAR CHOIMBOL**, *et al*,

      Plaintiff,

v.                                        CIVIL ACTION NO. 2:05cv463

**FAIRFIELD RESORTS, INC.**, *et al.*,

      Defendants.

*MEMORANDUM OPINION & ORDER*

This matter comes before the Court on Defendant's Fairfield Resorts, Inc. ("Fairfield"), Fairfield Kingsgate Property Owners Association, Inc. ("Kingsgate"), and Governor's Green Vacation Owners Association, Inc. ("Governor's Green"), Motion for Partial Judgment on the Pleadings pursuant to Rule 12(c) of the Federal Rules of Civil Procedure. Specifically, Defendants move to dismiss Counts II (Unjust Enrichment), III (Conspiracy and Fraud), and IV (Racketeer Influenced and Corrupt Organizations Act ("RICO") and RICO conspiracy) of Plaintiff's Amended Complaint. For the reasons that follow, Defendant's Motion to dismiss Counts II, III, and IV is **GRANTED**.

**I. FACTS AND PROCEDURAL HISTORY**

For the purposes of the motion, the Court assumes the following facts are true. Plaintiffs are current or former employees of Fairfield Resorts Inc., Robert W. "Bob" Nunnery ("Nunnery"), Petra Chemical & Consulting, Inc. ("PC&C"), HK Services, Inc. ("HK Services"), Mykhaylo "Mike" Sandulyak ("Sandulyak"), Kelly Kahler, Dan Carusone, Steve Sharkey, Bill Cyphers, Kingsgate Property Owners Association ("Kingsgate"), A to Z Best Services Inc. ("A

to Z"), and Governor's Green Vacation Owners Association, Inc. ("Governor's Green") (collectively "Defendants").

Fairfield is a Florida corporation engaged in the timeshare business with its headquarters and principal place of business in Orlando, Florida. Fairfield does substantial business in the Eastern District of Virginia including particularly at its Kingsgate, Governor's Green, and Patriot Place timeshare locations. Fairfield enlisted the services of Sandulyak and Nunnery to recruit and hire immigrants to perform laundry, housekeeping, and other grounds maintenance services at Fairfield's properties in Williamsburg, Virginia. Sandulyak, operating under the name Carolina Janitorial, is a regional provider of immigrant labor that conducted business with Ambassador Hospitality ("Ambassador") and Proline Management ("Proline"), national providers of immigrant labor that are commonly owned, staffed and operated.[1]

Before March 6, 2002, Ambassador contacted Fairfield about providing immigrant labor for its resort and hotel services. In response, Fairfield referred Ambassador to Nunnery who negotiated an agreement with Ambassador, in the name and on behalf of Fairfield. This agreement was forwarded to the Fairfield's District Property Manager, Rand Gritts, who signed the agreement on receipt. The agreement provided that Plaintiffs would remain employees of Carolina Janitorial, and thus be Carolina Janitorial's sole responsibility. Further, the agreement provided that Fairfield had no right to supervise, direct or control Plaintiffs. Through foreign visits and the internet, Sandulyak began recruiting Plaintiffs in Mongolia, Russia, Ukraine,

---

[1] Genesis Management Services Corporation ("Genesis Management") and Genesis Janitorial Services, Inc. ("Genesis Janitorial"), are parent and/or sister companies of Ambassador and Proline. Genesis Management, Genesis Janitorial, Ambassador, and Proline have all been named Third-Party Defendants by Defendants Fairfield and PC&C. Subsequently, Ambassador filed a counterclaim against Defendants Fairfield and PC&C and a cross claim against Defendant Nunnery.

Slovakia, America and elsewhere to provide housekeeping, grounds keeping, and other similar services to Fairfield. However, contrary to the agreement, once Plaintiffs were employed on Fairfield's premises, Sandulyak did not supervise, direct or control Plaintiffs' work. There was no Carolina Janitorial manager on premises, and Sandulyak visited Fairfield's premises only once every 1-3 months. During the relevant times, Nunnery actually supervised, directed and controlled Plaintiffs day-to-day work. This framework continued for over a year.

On April 21, 2003, Nunnery, on behalf of Fairfield, terminated the contract that existed between Fairfield and Ambassador. At that time, Nunnery, as the sole shareholder of PC&C, entered into a new contract on behalf of Fairfield whereby Ambassador continued the previous working relationship, but decreased the per worker hour compensation from $9.50 to $9.35. Business between Nunnery, PC&C, Fairfield, Ambassador, and Sandulyak continued under this agreement for approximately two years.

During the relevant time periods, Nunnery, acting on behalf of and for the benefit of Fairfield, PC&C and HK Services, supervised Plaintiffs as they provided services to Fairfield. Further, Nunnery, on behalf of the aforementioned parties, kept track of Plaintiffs weekly hours through the use of contract labor summaries, otherwise known as timecards. Nunnery forwarded these timecards, through either email or telefax, to Ambassador, Proline, Sandulyak, and Carolina Janitorial. Once received, the hours would be divided and invoiced by work areas and sent, by telefax, to PC&C.

Through HK Services, Nunnery, as sole shareholder, was also able to provide immigrant labor to Fairfield without Ambassador or Proline serving as the "middleman." Nunnery also supervised, directed and controlled the immigrants recruited through HK Services. Additionally, during this period of time, the payment hierarchy first worked as follows: Fairfield

paid money for Plaintiffs' services to Nunnery, who then paid Ambassador, which paid Carolina Janitorial, who then paid Plaintiffs. However, Nunnery began withholding money, converting it for his own personal use, and failing to pay Ambassador. Accordingly, the hierarchy for payment changed as follows: Fairfield paid monies for Plaintiffs' services to Ambassador directly, who then paid Carolina Janitorial, who then paid Plaintiffs. However, even with the latter payment structure in place, Plaintiffs allege that they worked over 40 hours per week, and were not paid overtime. Plaintiffs allege that Fairfield, Nunnery and PC&C conspired with Ambassador and Proline to label Plaintiffs as "subcontractors" or "contractors" instead of "employees" so as to avoid paying overtime, and any legal liability associated with such failure to pay overtime. Plaintiffs allege further that, during this time, they were required to pay deposits to Sandulyak, Carolina Janitorial, and Nunnery as a condition of working.

On or about March 30, 2005, Ambassador sent Fairfield a new agreement that increased the hourly rate to $9.85. Ambassador proposed that Fairfield implement a new labor model by staffing with its own employees under the "H2b Visa Program" instead of using Sandulyak and Carolina Janitorial. Fairfield agreed to try the H2b Visa Program and the agreement was redrafted with a provision for another hourly rate increase to $10.50, plus overtime. Ultimately, Fairfield failed to sign the new agreement. From March 28, 2005 to May 8, 2005, Fairfield continued to use the payment structure that was in place under the old agreement.

On May 9, 2005, Fairfield terminated approximately twenty-two immigrant workers, whose wages had previously been withheld by Nunnery. Further, Nunnery, on behalf of Fairfield, advised Ambassador that Fairfield would be terminating their contract. However, Fairfield told Sandulyak and Carolina Janitorial that the immigrant workers had instead abandoned their positions. At this time, Fairfield allowed Nunnery, HK Services, and PC&C to

take the place of Ambassador. Throughout this time, although Fairfield represented that Nunnery, HK Services, and PC&C were mere contractors, they engaged in actions and received benefits of an employee.

Shortly thereafter, Fairfield stopped utilizing the services of Nunnery, HK Services and PC&C. Fairfield enlisted and contracted A to Z, another provider of immigrant workers (operating out of New York), to recruit workers for Fairfield's various locations, including Governor's Green. As Fairfield's new "middleman," A to Z supervised, directed and controlled the daily assignments of the workers. Again, although Fairfield represented that A to Z was a mere contractor, A to Z engaged in the actions and received the benefits of an employee.

Plaintiffs allege that by February, 2006, Fairfield knowingly delayed paying the hourly wages of immigrant workers through A to Z for weeks. As a result, A to Z threatened to cause a work stoppage by the workers. Due to their strained relationship, Fairfield once again, replaced its middleman. A to Z was replaced by SCC of Miami ("SCC"). Presently, SCC funnels immigrant labor to Fairfield, specifically, Latino and/or Hispanic workers.

Plaintiffs alleges that Fairfield continues to conspire with both, A to Z and SCC to manipulate and falsify hourly rates of immigrant workers by misrepresenting the minimum wage and overtime pay for which they are entitled. Plaintiffs allege that Fairfield preyed and continues to prey on the ignorance of the majority of immigrant workers who could not and still cannot speak, read or write the English language. On August 8, 2005, Plaintiffs filed their initial complaint.[2] Shortly thereafter, Plaintiffs filed their first amended complaint on August 17, 2005.

---

[2] Plaintiffs make reference to a class action; however, class certification must be sought by a formal motion for class certification. Accordingly, until the Court grants class certification, each Plaintiff is viewed individually, and not as class members.

On October 18, 2005, the Court granted Plaintiffs leave to file a second amended complaint. Fairfield filed its answer to the second amended complaint on November 14, 2005. At the same time, Fairfield filed a Motion for Partial Dismissal of the Complaint. Plaintiffs filed a Memorandum in Opposition to the Motion for Partial Dismissal on November 28, 2005. Fairfield filed a reply on December 5, 2005. The Court DENIED Fairfield's Motion for Partial Dismissal on March 2, 2006. On April 27, 2006, Plaintiffs filed their corrected third amended complaint. On May 11, 2006, and May 17, 2006, both Fairfield and HK Services, Inc., filed answers to the corrected third amended complaint. On July 14, 2006, Fairfield, Kingsgate and Governor's Green filed a motion for judgment on the pleadings on their behalf and on behalf of all Defendants. Plaintiffs filed a Memorandum in Opposition to the Motion for Partial Dismissal on July 28, 2006. This matter is now ripe for adjudication.

## II. LEGAL STANDARD

Pursuant to Rule 12(c) of the Federal Rules of Civil Procedure, a motion for judgment on the pleadings is governed by the same standards applied to 12(b)(6) motion to dismiss for failure to state a claim. *Dauster v. Household Credit Servs., Inc.,* 396 F.Supp. 2d 663, 664 (E.D. Va. 2005)*; Edwards v. City of Goldsboro*, 178 F.3d 231, 243 (4th Cir. 1999). That is, as with a motion to dismiss, the Court accepts all facts alleged in the complaint as true and draws all reasonable factual inferences in the Plaintiff's favor. *Am Chiropractic Ass'n v. Trigon Healthcare, Inc.,* 367 F.3d 212, 229 (4th Cir. 2004) (citing *Mylan Lab., Inc. v. Matkari*, 7 F.3d 1130, 1134 n.4 (4th Cir. 1993)). Moreover, in evaluating a Rule 12(c) motion for judgment on the pleadings, the Court is limited to considering facts alleged in the complaint, any documents either attached to or incorporated in the complaint, matters of which the Court must take judicial

notice, and matters of public record. In order to find for the movant, the Court "must find beyond a doubt that the plaintiff could prove no set of facts in support of his claims which would entitle him to relief." *Bruce v. Riddle,* 631 F.2d 272, 273-74 (4th Cir. 1980).

### III. DISCUSSION

Plaintiffs' first cause of action under Count I seeks compensation for Defendants' failure to properly compensate Plaintiffs for minimum wage and overtime under the Fair Labor Standards Act of 1938 ("FLSA"). 29 U.S.C. § 207. Count II of Plaintiffs' complaint alleges that the Defendants were unjustly enriched as a result of the Defendants' permanent withholding of Plaintiffs' security deposits which were required as a condition for working, and withholding of the complete payment of weekly wages including overtime compensation, due to Plaintiffs. Count III contends that Defendants conspired to, and in fact, committed fraud by knowingly and intentionally misrepresenting to Plaintiffs that they were being compensated appropriate minimum and overtime wages. Count IV alleges that Defendants committed predicate acts of mail fraud, wire fraud and money laundering in violation of the Racketeering Influenced and Corrupt Organizations Act ("RICO"). Defendants move to dismiss Counts II, III and IV based on the assertion that the common law claims of unjust enrichment, fraud and conspiracy and the statutory claims under RICO are preempted by the Plaintiffs' claims under Count I pursuant to the FLSA.

A.     **Common Law Claims**

Defendants assert specifically, that the provisions of FLSA provide exclusive remedies for all of the alleged violations in this case, including both claims under Counts II and III. Plaintiffs counter argue that the FLSA does not explicitly pre-empt state tort law claims, noting for example, that the terms of the FLSA allows for states and municipalities to enact wage and hour legislation that is stricter than what is provided for in the FLSA. *See* 29 U.S.C. § 218(a); *see also Williamson v. Gen. Dynamics Corp.,* 208 F.3d 1144, 1151 (9th Cir. 2000) (holding that there was no preemption because the plaintiffs were never subject to the FLSA's anti-retaliation provision and thus, their common law claim for fraud did "not merely duplicate possible federal retaliation claims"). Plaintiffs further argue that the law is "unsettled" with respect to whether the FLSA precludes common law claims. The Court will address the common law claims in Counts II and III simultaneously.

Although it has yet to address common law preemption, the Fourth Circuit has employed the preemption principle in holding that the FLSA precluded a plaintiff's separate statutory claim under § 1983. *See Kendall v. City of Chesapeake,* 174 F.3d 437, 443 (4th Cir. 1989) (holding that the detailed remedies in the FLSA preempts the enforcement claims under § 1983 brought by plaintiffs). In addition, district courts considering FLSA and common law preemption have instructed that despite the lack of explicit preemption language in the statute, it is Congress' clear intent that the FLSA be "the sole remedy available to employees for enforcement of whatever rights he may have under the FLSA." *Lerwill v. Inflight Motion Pictures, Inc.,* 343 F. Supp. 1027 (N.D. Ca. 1972) (concluding that Congress intended that FLSA be the exclusive remedy for enforcing FLSA rights); *see also Johnston v. Davis Security, Inc.,* 217 F. Supp. 2d

1224, 1227 (D. Utah 2002) (rejecting reliance on the state's ability to apply stricter wage and hour status under the FLSA as compelling rationale to allow common law claims).

In reaching this conclusion, the *Lerwill* court went on to explain: "A brief review of the legislative history of the Act, as amended has not revealed an express statement of such intention. On its face however, a clearer case of implied intent to exclude other alternative remedies by the provision of one would be difficult to conceive. It should not require resort to Latin maxims of construction to show that the provision of one detailed remedy, which necessarily works to define the substantive right to be enforced, would exclude the possibility of alternative remedies in the absence of a clear showing that Congress intended such alternatives." *Lerwill,* 343 F. Supp. at 1028.

Under Section 216 of the FLSA, any employer violating the statute shall be liable to employees affected in the amount of their unpaid minimum wages, or their unpaid overtime compensation, as the case may be, and in an additional equal amount as liquidated damages. 29 U.S.C. § 207, 216; *see Tombrello v. USX Corp.*, 763 F.Supp. 541, 544 (N.D. Ala.1991). The FLSA directly addresses and provides relief for the allegations made by Plaintiffs in this case: overtime and minimum wage compensation. Plaintiffs "cannot circumvent the exclusive remedy prescribed by Congress by asserting equivalent state law claims in addition to the FLSA claim" in this instant case. *Nettles v. Techplan Corp.,* 704 F. Supp. 95, 100 (D.S.C. 1998) (holding that plaintiff's common law negligence claims were preempted by the FLSA because the statute provided the ability to recover overtime wages); *see also Morrow v. Green Tree Servicing, L.L.C.*, 360 Supp. 2d 1246, 1252 (M.D. Ala. 2005).

Plaintiffs further argues that the common law claims in Counts II and III are independent of its FLSA claims. Defendants counter that such claims simply duplicate the Plaintiffs' FLSA claims. In light of Congress' intent to provide a comprehensive remedial scheme under the FLSA as previously noted, district courts examining the issue of preemption have repeatedly focused on whether the factual basis for claims essentially duplicate or are equivalent to the plaintiffs' respective FLSA claims. *See, e.g. Petras v. Johnson,* No. 92 Civ. 92 Civ. 8298, 8464 (S.D.N.Y. 1993); *Moeck v. Gray Supply Corp.*, 2006 WL 42368, at 1-2 (D. N.J. Jan. 6, 2006) (dismissing fraud claim for material misrepresentation regarding entitlement to overtime); *Chen v. Street Beat Sportswear, Inc.*, 364 F. Supp.2d 269 (E.D.N.Y. 2005) (holding that the common law fraud and negligent misrepresentation claims were overtime claims directly covered by the FLSA); *Johnson v. Davis Security, Inc.,* 217 F. Supp. 2d 1224, 1227028 (D. Utah 2002) (dismissing common law claims because the factual basis did not give rise to actions separate from plaintiff's claims under the FLSA); *Lerwill,* 343 F. Supp. at 1027.

For example, in *Petras*, a case very similar to the instant case, the plaintiff brought suit against the defendant for common law fraud in conjunction with FLSA claims for overtime pay and liquidated damages and attorneys fees, on the grounds that the defendants knowingly and with intent to misrepresent and deceive the plaintiff, made false misrepresentations to him to lead him to believe that he was not entitled to overtime pay. *See* at 3. The plaintiff asserted that the claim was independent of the claims under the FLSA. *Id.* The court agreed and dismissed the plaintiff's common law fraud and punitive damage claims because those common law claims were "nothing more than a claim that the defendants intentionally frustrated the overtime laws, a statutory violation for which Section 216(b) of the statute provides exclusive relief in the form of

unpaid compensation plus liquidated damages." *Id* at 3. *See also Chen v. Street Beat Sportswear, Inc.,* 364 F. Supp. 2d 269, 293 ( E.D.N.Y. 2005) (reasoning that negligence claims are dismissed because they are based on the same set of facts as the FLSA claims); *compare Washington v. Fred's Stores of Tennessee, Inc.*, 427 F. Supp. 2d 725 (S.D. Miss. 2006) (the common law negligence claim was not duplicative of the FLSA claims because it was based on conduct independent of claims under the FLSA: defendant's failure to supervise and manage employees).[3] Likewise, in the instant case, the Plaintiff's common law claims under Counts II and III stem directly from their minimum wage and overtime claims under the FLSA. Defendants withholding of deposits and misrepresentation of minimum wage and overtime pay due to Plaintiffs merely recasts the central claim in this case: violation of the FLSA. Because the Court finds that the FLSA provides an exclusive remedial scheme for such conduct, the Court cannot allow the Plaintiffs' claims under Count II and III to proceed.

**B.     RICO Claims**

Defendants also move the Court to dismiss Count IV of the Plaintiffs' complaint. Defendants argue that similar to the common law claims in Counts II and III, the Plaintiffs' RICO claim must be dismissed because they seek additional remedies precluded by the FLSA. Plaintiffs respond that RICO is not preempted by the FLSA because it is complimentary to and in furtherance of the FLSA. Specifically, Plaintiffs assert that while the FLSA was intended to

---

[3] Plaintiffs also cited *Paukstis v. Kenwood Golf & Country Club, Inc.,* 241 F. Supp. 2d 551 (D. Md. 2003), in support of their proposition that the law is "unsettled." A few courts have allowed common law claims to proceed alongside FLSA claims in the context of facts similar to the instant case, the Court found those cases distinguishable. For example, like *Washington*, *Paukstis* is distinguishable because the common law claims were distinct from the FLSA claims. In contrast to this case, plaintiff in *Paukstis* did not seek overtime pay itself under the common law. *Id.*

11

remedy "pedestrian" violations by employers, RICO is designed to address the grand systematic schemes present in this instant case.

The parties did not provide, and the Court's research did not reveal cases directly on point with respect to the FLSA's preclusion of RICO claims specifically. However, the Fourth Circuit's consideration of whether RICO claims are preempted by statutes comparable to the FLSA and a careful review of the remedial schemes of both RICO and the FLSA provide the Court with compelling logic to determine, as a matter of law, that Plaintiffs' RICO claims are precluded in this case.

The FLSA provides a sufficiently punitive scheme to address the Defendants' misconduct in this case. In *Kendall v. City of Chesapeake*, the Fourth Circuit relied on this rationale to uphold the District Court's finding that the plaintiff's independent claims under § 1983 were precluded by the "comprehensive enforcement scheme that is incompatible with the individual enforcement under § 1983." 174 F.3d 437, 443 (4th Cir. 1989). Similar to the analysis applied with respect to whether the FLSA preempts parallel common law claims, the court noted that the FLSA's "unusually elaborate" enforcement scheme manifested Congress' desire to exclusively define the private remedies available to redress violations of the statute's terms." *Id.* at 443. *See also Zombro v. Baltimore City Police Dept.*, 868 F.2d 1364, 1366 (4th Cir. 1989) (explaining that the mere assertion that another right has been somehow infringed does not defeat the coverage, application and exclusivity of a comprehensive statutory scheme specifically enacted by Congress to redress the alleged violation of rights).

Analogously, despite Plaintiffs' contention in this case that the FLSA fails to sufficiently punish the grand systematic schemes addressed by RICO (and that Defendants are attempting to

immunize themselves from full liability), the FLSA provides a "careful blend of administrative and judicial enforcement powers" which "includes criminal penalties for willful violators of the minimum wage and overtime provisions; a private right of action permitting employees to sue in federal or state court to recover unpaid minimum wage and overtime compensation, liquidated damages, attorneys fees, and costs; and authorization for the Secretary of Labor to supervise payment of unpaid compensation due under the Act and to bring actions for compensatory and injunctive relief for violations of the Act's minimum wage and overtime provisions."[4] *Kendall,* 868 F.2d at 443.

The rationale employed by other courts in dismissing RICO Claims brought along side other statutes which, like the FLSA, provide comprehensive remedies, also leads the Court to find Plaintiffs' RICO claims precluded. *See Danielson v. Burnside-Ott Aviation, Training Center,* 746 F. Supp. 170 (D.D.C. 1990), (citing *Norman v. Niagara Mohawk Power Corp.,* 873 F.2d 634, 637-638 (2d Cir. 1989) (RICO dismissed where Energy Reorganization Act provided exclusive remedy for plaintiff's claims)); *Bodimetric Health Servs., Inc. v. Aetna Life & Casualty,* 903 F.2d 480, 486-87 (holding that RICO claim is precluded by administrative benefits determination procedure under the Social Security Act); *Butchers' Union, Local No. 498 v. SDC Inv., Inc.,* 631 F.Supp. 1001 (E.D. Cal.1986). For example, in *Danielson*, the court dismissed the plaintiffs' RICO claim based on allegations pursuant to the Services Contract Act ("SCA").[5]

---

[4] The FLSA's punitive remedies also include punitive possibilities that go beyond fines and wage compensation by providing for imprisonment. See 29 U.S.C. § 216 (a).

[5] The SCA forbids service employees working on government contacts to be paid wages below the prevailing wages being paid in the locality by non-government contractors. Like the FLSA, Section 2 of the Act requires the inclusion of specific provisions of the minimum wage and fringe benefit levels for employees. The SCA provides for such minimum wage and fringe benefit levels in contracts entered into by the United States in excess of $2,500, "the principal purpose of which is to furnish services in the United States through the use of service employees." See 41 U.S.C. § 351(a). Moreover, under the SCA, the wage and benefit level determination are explicitly directed to the responsibility of the Secretary of Labor. See 41 U.S.C. § 351(a)(1).

Relying on reasoning employed in earlier cases, the *Danielson* court noted that the plaintiff's alleged fraudulent scheme including among other things, mail fraud and intentionally defrauding employees, was essentially an underpayment of wages and fringe benefits claim pursuant to the SCA. *Danielson,* 746 F. Supp. at 176. The Court explained: "Plaintiffs' RICO Claims are all premised on alleged violations of the SCA. However, the SCA expressly assigns the responsibility for determining and enforcing wage levels and other employee benefits to the DOL. Allowing [p]laintiffs to proceed with their RICO claims would … upset the careful blend of administrative and judicial powers that Congress has created under the SCA . . . ." *Id.* The court further noted that plaintiffs' RICO claims "stripped to its core"alleged violations under the SCA. *Id. at* 177. The same is true in this instant case. But for the proscriptions of the FLSA, the Defendants conduct would not constitute the fraudulent scheme Plaintiffs allege. *See Butchers' Union*, 631 F.Supp. at 1011 (concluding that but for the proscriptions of the labor law, defendant's conduct would not be either mail or wire fraud). The FLSA provides direct relief for such violations. Accordingly, the Court finds that the FLSA preempts the assertion of RICO claims.

### IV. CONCLUSION

For the foregoing reasons, Defendants Fairfield, Kingsgate and Governor Green's Motion to Dismiss Counts II, III and IV is **GRANTED**.

Further, in light of the Court's dismissal of all but Plaintiffs' claims under the FLSA, the request to conduct limited discovery to facilitate determination of class certification in this case is unnecessary and is therefore, now **DENIED**.

It is further ordered that the parties schedule a conference with a Magistrate Judge to seek settlement of the FLSA claims.

The Court **DIRECTS** the Clerk to send a copy of this Memorandum Opinion and Order to counsel of record.

**IT IS SO ORDERED.**

_____/s/_____
Raymond A. Jackson
UNITED STATES DISTRICT JUDGE

Norfolk, Virginia
September 11, 2006